# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY, on behalf of itself andall others similarly situated, | |
| Plaintiff, | Civil Action No. _____ |
| v. | |
| AMARIN PHARMA, INC., AMARIN PHARMACEUTICALS IRELAND LIMITED, and AMARIN CORPORATION PLC, | CLASS ACTION COMPLAINT and DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiff Teamsters Health & Welfare Fund of Philadelphia and Vicinity ("Plaintiff") brings this action on behalf of itself and all others similarly situated against Amarin Pharma, Inc., Amarin Pharmaceuticals Ireland Limited, and Amarin Corporation PLC(collectively "Amarin" or "Defendants"). These allegations  are based on investigations of counsel, publicly available materials and knowledge, information, and belief.

## INTRODUCTION

1.     This is an action under the Sherman Act and various state laws arising from Defendants' illegal scheme to delay competition in the United States and its territories for Vascepa, a prescription medication approved by the U.S. Food and Drug Administration ("FDA") to treat hypergyceridemia in adults. Plaintiff seeks overcharge damages arising from Defendants'

unlawful scheme to prevent generic competition for Vascepa.

2. Since Amarin first began marketing Vascepa in 2012, it has engaged in an anticompetitive strategy to block generic competition for Vascepa, its sole product, by hoarding the world's supply of the active pharmaceutical ingredient needed to make the drug.

3. The active ingredient in Vascepa is icosapent ethyl ("IPE"), made from eicosapentaeonic acid ("EPA"), an omega-3 fatty acid found in fish oil. Vascepa has been shown both to lower triglycerides and to reduce the risk of cardiovascular events in patients who have high triglycerides (150 mg/dL or higher). In 2020, annual sales of Vascepa in the United States were over $600 million.

4. In September and October of 2016, four drug companies filed applications with the FDA to launch generic versions of Vascepa: Roxane Laboratories, Inc. and related entities, later acquired by Hikma Pharmaceuticals Plc ("Hikma"), Dr. Reddy's Laboratories Inc. ("DRL"), Teva Pharmaceuticals USA, Inc. and related entities ("Teva"), and Apotex, Inc. ("Apotex").[1] Hikma, DRL, and Teva each contended that all of the asserted patent claims were either invalid or not infringed by their respective generic version of Vascepa. Amarin sued each of these generics in turn. Apotex contended that some of the asserted patent claims were either invalid or not infringed by Apotex's generic version of Vascepa but did not challenge all of the asserted patent claims.

5. Amarin settled with Teva in May 2018 and Apotex in June 2020. Pursuant to those agreements, Teva and Apotex agreed to forego selling their respective generic versions of Vascepa in the United States until August 9, 2029, or earlier under certain circumstances.

6. Hikma and DRL, however, continued their patent fights and won at trial. On March 30, 2020, Judge M. Du Miranda, Federal District Court Judge for the District of Nevada, held that

---

[1] Applications were previously filed with the FDA, but they were rejected after Amarin successfully extended its New Chemical Entity exclusivity period, rendering those earlier-filed applications premature.

Amarin's patents were invalid due to obviousness.

7.      After its patent victory, DRL promptly began preparations to launch generic Vascepa, "only to discover that Amarin had foreclosed all the suppliers of the icosapent ethyl API who have sufficient capacity to support a commercial launch in a timely manner."[2]

8.      Hikma received FDA approval to launch its generic version of 1 g Vascepa on May 22, 2020.

9.      DRL received FDA approval to launch its generic version of 1 g Vascepa on August 7, 2020. As of that date, DRL had removed all legal and regulatory barriers to its entry into the market for 1 g Vascepa, but it has been entirely foreclosed from entering that market due to Amarin's use of a series of exclusive contracts and other anticompetitive conduct to lock up the world's supply of IPE, the active pharmaceutical ingredient in Vascepa. Amarin had secured a supply of several times Amarin's own needs based on its anticipated sales.

10.     Amarin lost its appeal of Judge Miranda's March 30, 2020, invalidity order on September 3, 2020.

11.     Hikma launched limited amounts of its 1 g generic Vascepa on November 5, 2020, hampered by Amarin's anticompetitive capture of the world's supply of IPE.

12.     Amarin was able to prevent DRL's generic Vascepa launch and limit Hikma's launch by purposely contracting with at least four different API manufacturers[3] – one or two is standard in the pharmaceutical industry – using agreements that prevent these suppliers from selling IPE API to any other manufacturer,[4] and has otherwise foreclosed access to at least one

---

[2] Complaint, Doc. No. 1, *Dr. Reddy's Laboratories Inc. v. Amarin Pharma, Inc., Amarin Pharmaceuticals Ireland Limited, and Amarin Corporation PLC*, No. 3:21-cv-10309-BRM-ZNQ (D.N.J. Apr. 27, 2021) ("DRL Complaint"), ¶3.
[3] Nisshin Pharma Inc., Equatez Ltd., Chemport Inc., and Novasep.
[4] *See, e.g.*, Amarin Corp. plc, Quarterly Report (Form 10-Q), at 16 (Nov. 8, 2011) ("Following FDA approval of [Vascepa] both agreements [with Equateq and Chemport] include annual purchase levels enabling Amarin to ***maintain supply exclusivity*** with each respective supplier") (emphasis added).

other major supplier.

13.     Amarin has no legitimate procompetitive reason for entering into exclusive supply agreements with these four manufacturers. The total annual capacity of these suppliers has been more than triple Amarin's requirements at relevant times in the past and is at least double Amarin's current requirements.

14.     Notably, Amarin has repeatedly touted its anticompetitive scheme to investors, often coyly referring to "taking advantage of manufacturing barriers to entry,"[5] but sometimes bluntly stating that the addition of a new supplier "fortifies Amarin's efforts to shield its Vascepa patent beyond its scheduled 2030 expiration."[6]

15.     As a result of Amarin's scheme, DRL's launch of generic Vascepa has been delayed since August 2020, Hikma's launch of generic Vascepa has been constrained by limited supply, and Plaintiff and members of the class have been forced to pay anticompetitive prices for Vascepa and its generic equivalent.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than one hundred members of each class; and at least one member of each of the putative classes is a citizen of a state different from that of Defendants.

17.     This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a).

---

[5] Amarin Corp. plc, Annual Report (Form 10-K), at 3 (Feb. 29, 2012).
[6] Press Release, Amarin Corp. plc, "Amarin Announces Approval of Supplemental New Drug Application for Chemport as Additional Vascepa® Active Pharmaceutical Ingredient Supplier" (Apr. 18, 2013), https://investor.amarincorp.com/news-releases/news-release-details/amarin-announces-approval-supplemental-new-drug-application (last accessed July 7, 2021).

18.     Venue is appropriate within this District under 28 U.S.C. § 1391. Defendants transact business within this District and/or have agents in and/or that can be found in this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District. At all relevant times, Amarin's U.S. operations were headquartered in this District.

19.     The Court has personal jurisdiction over Defendants. Defendants have transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme throughout the United States, including in this District. The scheme has been directed at and has had the intended effect of causing injury to individuals and companies residing in or doing business throughout the United States, including in this District. Personal jurisdiction lies under Fed. R. Civ. P. 4(k)(2) over the foreign domiciliary defendants.

## THE PARTIES

### A. Plaintiff

20.     Plaintiff Teamsters Health & Welfare Fund of Philadelphia and Vicinity is a health and welfare benefits plan headquartered and with a principal place of business in Pennsauken, New Jersey. Plaintiff provides health and welfare benefits to members and participants who reside in numerous locations in the United States. Plaintiff purchased and/or provided reimbursement for some or all of the purchase price for Vascepa other than for resale in Delaware, Florida, Indiana, Maryland, New Jersey, and Pennsylvania at supracompetitive prices during the Class Period and has thereby been injured. In addition, there is a substantial probability that in the future Plaintiff will purchase Vascepa manufactured by Amarin. Plaintiff also has purchased and/or intends to purchase generic versions of Vascepa, other than for resale, once they become available. Plaintiff paid and reimbursed more for these products than they would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets for Vascepa.

### B. Defendants

21.    Defendant Amarin Pharma, Inc. is a company organized and existing under the laws of Delaware with its principal place of business at 1430 Route 206, Bedminster, NJ 07921.

22.    Defendant Amarin Pharmaceuticals Ireland Limited is a company incorporated under the laws of Ireland with registered offices at 88 Harcourt Street, Dublin 2, Dublin, Ireland.

23.    Defendant Amarin Corporation plc is a company incorporated under the laws of England and Wales with principal executive offices at 77 Sir John Rogerson's Quay, Block C, Gran Canal Docklands, Dublin 2, Ireland. Defendants Amarin Pharma, Inc., Amarin Pharmaceuticals Ireland Limited, and Amarin Corporation plc are collectively referred to herein as "Amarin."

## REGULATORY BACKGROUND

### A. The Regulatory Structure for Approval of Drugs

24.    Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), a company seeking to market a new drug must obtain the approval of the FDA by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301-92. An NDA must include specific data concerning the safety and effectiveness of the drug, as well as information on applicable patents. 21 U.S.C. §§ 355(a), (b).

25.    When the FDA approves a brand manufacturer's NDA, the brand manufacturer may list in the FDA's book of Approved Drug Products with Therapeutic Equivalence Evaluations (called the "Orange Book") any patent that it certifies (1) claims either the approved drug product or approved methods of using the drug product, and (2) could reasonably be asserted against a generic manufacturer who makes, uses, or sells the drug product without authorization prior to the expiration of the listed patent(s). Relevant patents issued after NDA approval must be listed in the Orange Book within 30 days of issuance. 21 U.S.C. §§ 355(b)(1), (c)(2).

26.     The FDA relies completely on the brand manufacturer's certification about its patents, as the FDA does not have the resources or authority to verify the patents for accuracy or trustworthiness. In listing patents in the Orange Book, the FDA merely performs a ministerial act.

### a. The Hatch-Waxman Amendments and Approval of Generic Drugs

27.     In 1984, Congress enacted the Hatch-Waxman Amendments to the FDCA to expedite the entry of less expensive generic competitors to brand drugs to reduce healthcare expenses nationwide, while also providing for patent term extensions and the ability to file prelaunch infringement suits to bolster pharmaceutical companies' financial incentives to create new and innovative products.

28.     The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches and ushering in an era of historic revenues and profits for brand pharmaceutical manufacturers. The Hatch-Waxman Amendments simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs.

29.     A manufacturer seeking approval to sell a generic version of a brand drug may instead file an ANDA. An ANDA relies on the scientific findings of safety and effectiveness included in the NDA for the brand drug, or reference listed drug ("RLD"). The ANDA applicant must further show that the generic drug is bioequivalent (i.e., that the active ingredient of the proposed generic drug is absorbed in the patient's blood stream to the same extent and for the same amount of time as the RLD), and that it is pharmaceutically equivalent (e.g., that it contains the same active ingredient(s), dosage form, route of administration, and strength as the RLD). Generic drugs that are both bioequivalent and pharmaceutically equivalent are considered "therapeutically equivalent" to the RLD.

30.     The FDCA and Hatch-Waxman Amendments operate on the proven scientific principle that therapeutically equivalent drugs are substitutable. Generic drugs that are therapeutically equivalent to their brand counterparts are given an "AB" rating by the FDA, a designation which causes a pharmacy presented with a prescription for the brand to automatically dispense the generic instead.

   b.  **Paragraph IV Certifications**

31.     Under the Hatch-Waxman Amendments, 21 U.S.C. § 355(j)(2)(A)(vii), a generic manufacturer's ANDA must contain one of four certifications:

   (i)     That no patent for the brand drug has been filed with the FDA (a "Paragraph I certification");

   (ii)    That the patent for the brand drug has expired (a "Paragraph II certification");

   (iii)   That the patent of the brand drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III certification"); or

   (iv)    That the patent for the brand drug is invalid, unenforceable, and/or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").

32.     To obtain FDA approval of an ANDA prior to the expiration of a patent or patents listed in the Orange Book, a generic manufacturer must file a Paragraph IV certification and serve timely notice to the brand manufacturer. The filing of an ANDA with a Paragraph IV certification gives rise to a cause of action for patent infringement pursuant to 35 U.S.C. § 271(e)(2). If the brand manufacturer initiates a patent infringement action against the generic filer within 45 days of receiving notice of the Paragraph IV certification, the FDA will not grant final approval to the ANDA until the earlier of (a) the passage of thirty months (the "30-month stay"), or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. 21 U.S.C. § 355(j)(5)(B)(iii).

33.     The FDA may grant tentative approval to an ANDA when it determines that the ANDA would otherwise be ready for final approval but for the existence of an unexpired patent for which the generic filer has submitted a Paragraph III certification (i.e., that the generic does not intend to market the ANDA product prior to the expiration of the patent) or the existence of a regulatory exclusivity, such as the 30-month stay.

**B.  The Benefits of AB-Rated Generic Competition**

34.     Since the FDA deems AB-rated generic versions of brand drugs to be just as safe and effective as their brand counterparts, the only material mode of differentiating the two is their price. On average, generics are at least 10% less expensive than their brand counterparts when there is a single generic competitor. This discount typically increases to 50-80% (or more) when there are multiple generic competitors on the market for a given brand.

35.     Every state has adopted laws that either require or permit pharmacies to automatically substitute AB-rated generic equivalents for brand prescriptions (unless the prescribing physician has affirmatively requested the brand). Accordingly, once one generic equivalent enters the market, the generic quickly captures sales of the corresponding brand drug, often capturing 80% or more of the brand's sales within the first six months.

36.     The Federal Trade Commission ("FTC") found that by 12 months after generic entry, generics on average capture 90% of corresponding brand drug sales and (with multiple generics on the market) prices drop 85% relative to brand prices. That is because once multiple generic competitors enter, the competitive process accelerates, and multiple generic sellers typically compete vigorously with each other for market share by driving prices further down toward marginal manufacturing costs. As a result, competition from generic drugs is viewed by brand drug companies as a grave financial threat.

37.     By contrast, generic competition enables purchasers (like Class members here) to purchase substantially less expensive generic versions of a drug instead of the more expensive brand, and to purchase generic versions of a drug at increasingly lower prices as more generic versions of that brand drug enter the market. In addition, generic competition enables purchasers to pay lower prices for their remaining brand drugs when the brand company lowers its brand price to compete with the generic for sales.

38.     Once exclusivity is lost and generic entry occurs—an event sometimes referred to as the "patent cliff"—the brand manufacturer can expect a significant drop in profits, as it is forced to either compete by dramatically lowering prices or accept dramatically lower sales. The tradeoff of longer exclusivity rights in return for quick and effective generic entry after loss of exclusivity was fundamental to the policies and procedures that Congress established in the Hatch-Waxman Act, and embraced by the states in their generic substitution laws.

**C. Regulatory Exclusivities for New Drugs**

39.     In order to promote a balance between new drug innovation and generic drug competition, the Hatch-Waxman Amendments also provided for exclusive marketing rights for new drugs. These exclusivities are granted by the FDA upon approval of a drug if statutory requirements are met. These exclusivities are listed in the Orange Book, along with any applicable patents and can run concurrently with the listed patents.

40.     One such exclusivity, New Chemical Entity (NCE) exclusivity, applies to products containing chemical entities never previously approved by FDA either alone or in combination. If a product receives NCE exclusivity, the FDA may not accept for review any ANDA for a drug containing the same active moiety for five years from the date of the NDA's approval, unless the ANDA contains a certification of patent invalidity or non-infringement, in which case an

application may be submitted after four years. 21 U.S.C. § 355(j)(5)(F)(ii); 21 C.F.R. § 314.108(b)(2).

41.     A drug product may also receive a three-year period of exclusivity if its sponsor submits a supplemental application that contains reports of new clinical investigations (other than bioavailability studies) conducted or sponsored by the sponsor that were essential to approval of the supplemental application. If this exclusivity is granted the FDA may not approve an ANDA for that drug for three years from the date on which the supplemental application is approved. 21 U.S.C. § 355(j)(5)(F)(iv); 21 C.F.R. § 314.108(b)(2)(5).

**D.  Supply and Use of API in Drug Products**

42.     Brand and generic manufacturers ordinarily purchase the API for their drugs from API suppliers Although a generic manufacturer's process for manufacturing the final dosage form may be different from the manufacturer of the RLD, it is typical for the different manufacturers to use identical API.

43.     In order to sell API in the United States, the API manufacturer ordinarily must file a Drug Master File ("DMF") with the FDA. The DMF provides "confidential detailed information aboutfacilities, processes, or articles used in the manufacturing, processing, packaging, and storing of"the API.[7] To use an API for a specific drug, the brand or generic drug manufacturer must reference the API supplier's DMF in its application to the FDA. In reviewing the drug manufacturer's NDA or ANDA, the FDA then reviews the technical information contained in, and inspects the relevant facilities described in, each DMF. A single DMF may be referenced by multiple manufacturers.

---

[7] Guidelines For Master Drug Files, § I, https://www.fda.gov/drugs/guidances-drugs/drug-master-files-guidelines (last accessed July 7, 2021).

44. The entire process of API development and FDA approval of a supplier's DMF in support of an NDA or ANDA takes between one and three years.

45. If a manufacturer wants or needs to change its API supplier for a drug, it must file a supplement with the FDA referencing the new API supplier's DMF and submit data for drug batches using the new supplier's API. The manufacturer may only market its drug using the new supplier's API if the FDA approves of the change. It is time consuming to prepare and file the necessary supplement and then obtain FDA approval of the change in API supplier.

46. If a current DMF holder is willing, a generic drug manufacturer may use API from an API supplier that already has a DMF on file and reference that DMF in their ANDAs. If, however, no current DMF holder is willing to supply the generic manufacturer with API, it must identify a new API supplier (who does not yet have a DMF on file) and work with that supplier to develop the API and submit a DMF.

47. Because of the significant costs involved in qualifying an API supplier as well as the need to continue to ensure quality control by the API supplier, it is industry practice for both brand and generic drug manufacturers to generally use only one or two API suppliers to support adrug application. Typically, a drug manufacturer will enter an exclusive contract with an API supplier only where there are concerns about ensuring an adequate API supply for manufacturing a drug.

## FACTS

### A. Vascepa

48. Vascepa is the brand name for the icosapent ethyl drug product marketed by Amarin, manufactured using the active pharmaceutical ingredient IPE, which is derived from eicosapentaenoic acid ("EPA"), a type of omega-3 fatty acid derived from fish oil.

49.     On July 26, 2012, Amarin received FDA approval to market Vascepa: "as an adjunct to diet to reduce triglyceride (TG) levels in adult patients with severe (≥500 mg/dL) hypertriglyceridemia." Subsequently, the FDA determined that Vascepa was entitled to NCE exclusivity, *see supra* at paragraph 40, which ran from the NDA approval date to July 26, 2017.

50.     On December 13, 2019, the FDA approved a new indication for Vascepa: "as an adjunct to maximally tolerated statin therapy to reduce the risk of myocardial infarction, stroke, coronary revascularization, and unstable angina requiring hospitalization in adult patients with elevated triglyceride (TG) levels (≥ 150 mg/dL) and . . . established cardiovascular disease or . . . diabetes mellitus and 2 or more additional risk factors for cardiovascular disease." The new indication is entitled to data exclusivity, which is scheduled to expire on December 13, 2022.

51.     Amarin currently markets Vascepa in the 1 g and 500 mg strengths. Amarin has raised the price of 1 g Vascepa dramatically since its launch: the list price for the 1 g strength of Vascepa was estimated to be $308.25 per month in 2019, $355 per month in 2020, and is currently estimated to be around $368.86.

52.     Vascepa is Amarin's only product, with revenues of $607 million in 2020.[8]

**B. Amarin set out to lock up the world's supply of Vascepa API for the explicit purpose of preventing generic competition.**

53.     As discussed above, the API for Vascepa is IPE, which is derived from fish oil.

54.     For more than a decade, Amarin has set out to lock up the world's supply of IPE for the explicit purpose of "protecting the potential commercial exclusivity" of Vascepa.[9]

55.     From the beginning Amarin stated its intention to take advantage of manufacturing barriers to entry to prevent competition: "We will seek to protect the potential commercial

---

[8] Amarin Corp. plc, Annual Report (Form 10-K), at F-5 (Feb. 25, 2021).
[9] Amarin Corp. plc Annual Report (Form 10-K), at 3 (Feb. 20, 2012).

exclusivity of [Vascepa] through a combination of obtaining and maintaining intellectual property rights and regulatory exclusivity, ***taking advantage of manufacturing barriers to entry*** and maintaining trade secrets."[10]

56.     On April 18, 2013, Amarin announced that it had filed a supplemental New Drug Application ("sNDA") to add Chemport Inc. ("Chemport") as an API supplier. In that announcement Amarin confirmed that the "manufacturing barriers to entry" that it intended to take advantage of are the various exclusive contracts that it used to foreclose the supply of Vascepa API: "The addition of Chemport contributes to the planned expansion of the Vascepa manufacturing supply chain and ***is additional progress toward Amarin's goal to protect the commercial potential of Vascepa to beyond 2030 through a combination of patent protection, regulatory exclusivity, trade secrets and by taking advantage of manufacturing barriers to entry***."[11]

57.     Joseph Zakrewski, Amarin's CEO, further confirmed that the key barrier to entry was the supply of API, stating that: "The move [to add Chemport as an API supplier] ***also fortifies Amarin's efforts to shield its Vascepa patent beyond its scheduled 2030 expiration***."[12]

58.     Amarin further explained its anticompetitive strategy in its 2014 Annual Report:

"Certain of our agreements with our suppliers include minimum purchase obligations and limitedexclusivity provisions based on such minimum purchase obligations. If we do not meet the respective minimum purchase obligations in our supply agreements, our suppliers, in certain cases,will be free to sell the active pharmaceutical ingredient of Vascepa to potential competitors . . . While we anticipate that intellectual property barriers and FDA regulatory exclusivity will be

---

[10] *Id.* (emphasis added); *see also* Amarin Corp. plc Annual Report (Form 10-K), at 21 (Feb. 27, 2014) ("FDA marketing exclusivity is separate from, and in addition to, patent protection, trade secrets and manufacturing barriers to entry which also help protect Vascepa against generic competition.").

[11] Press Release, Amarin Corp. plc, "Amarin Announces Approval of Supplemental New Drug Application for Chemport as Additional Vascepa® Active Pharmaceutical Ingredient Supplier" (Apr. 18, 2013), https://investor.amarincorp.com/news-releases/news-release-details/amarin-announces-approval-supplemental-new-drug-application (last accessed July 7, 2021) (emphasis added).

[12] "Amarin wins U.S. nod to add S. Korea supplier," Hartford Business Journal (Apr. 19, 2013) (emphasis added), https://www.hartfordbusiness.com/article/amarin-wins-us-nod-to-add-s-korea-supplier (last accessed July 7, 2021).

theprimary means to protect the commercial potential of Vascepa, the availability of Vascepa active pharmaceutical ingredient from our suppliers to our potential competitors would make ourcompetitors' entry into the market easier and more attractive.[13]

59.     Amarin expected its scheme to work and wanted the market to know that fact:

In April 2012, the FDA published draft guidance for companies that may seek to develop generic versions of Vascepa. If an application for a generic version of Vascepa were filed and if new chemical entity, or NCE exclusivity is not granted to Vascepa, the FDA may accept the filing for review and we would likely engage in costly litigation with the applicant to protect our patent rights. If the generic filer is ultimately successful in patent litigation against us, meets the requirements for a generic version of Vascepa to the satisfaction of the FDA (after any applicable regulatory exclusivity period and, typically, the litigation-related 30-month stay period expires), ***and is able to supply the product in significant commercial quantities***, the generic company could, with the market introduction of a generic version of Vascepa, limit our U.S. sales, which would have an adverse impact on our business and results of operations.[14]

60.     Amarin further warned the market that failure of its anticompetitive scheme was a material investment risk: "Risks Related to our Reliance on Third Parties – We may not be able to maintain our exclusivity with our third-party Vascepa suppliers if we do not meet minimum purchase obligations due to lower than anticipated sales of Vascepa."[15]

**C. Amarin has, in fact, locked up the world's supply of Vascepa API.**

61.     To effectuate its anticompetitive scheme, Amarin has entered into exclusive or *de facto* exclusive agreements with at least four of the largest suppliers for icosapent ethyl API and has otherwise secured exclusive supply from yet another supplier.

---

[13] Amarin Corp. plc, Annual Report (Form 10-K), at 40 (March 3, 2015).

[14] Amarin Corp. plc, Quarterly Report (Form 10-Q), at 31 (Aug. 8, 2013) (emphasis added).

[15] Amarin Corp. plc, Quarterly Report (Form 10-Q), at 46 (Nov. 7, 2013); *see also* Amarin Corp.plc, Quarterly Report (Form 10-Q), at 59 (Aug. 7, 2014) ("Certain of our agreements with our suppliers include minimum purchase obligations and limited exclusivity provisions based on suchminimum purchase obligations. If we do not meet the respective minimum purchase obligations in our supply agreements, our suppliers, in certain cases, will be free to sell the active pharmaceutical ingredient of Vascepa to potential competitors of Vascepa. Similarly if we terminate certain of our supply agreements, such suppliers may be free to sell the active pharmaceutical ingredient of Vascepa to potential competitors of Vascepa. While we anticipate that intellectual property barriers and FDA regulatory exclusivity will be the primary means to protect the commercial potential of Vascepa, the availability of Vascepa active pharmaceutical ingredient from our suppliers to our potential competitors would make our competitors' entry intothe market easier and more attractive.").

62. In February 2009, Amarin entered into a supply agreement with Japan-based Nisshin Pharma Inc. ("Nisshin"), pursuant to which Nisshin agreed to supply Amarin with IPE (referred to as E-EPA in the agreement). Amarin paid Nisshin $500,000 when the agreement was signed and agreed to pay Nisshin another $500,000 when Amarin obtained approval to market Vascepa either in the U.S. or the European Union. The agreement contained a minimum purchase commitment.[16]

63. Amarin believed that Nisshin could produce sufficient quantities of API to support Amarin's launch of Vascepa. Nonetheless, it continued to amass API supply and suppliers.

64. In June 2011, the BBC reported that Amarin had entered into a supply agreement with Scotland-based Equateq Ltd. ("Equateq") pursuant to which Equateq agreed to supply Amarin with the API needed to manufacture Vascepa. Amarin again committed to significant, long-term purchases. In fact, although the CEO of Equateq refused to provide further specifics of the supply agreement, he claimed it was worth £100m over its life.[17] Amarin revealed to investors in August 2011 that the minimum purchase commitment was intended to prevent Equateq from selling Vascepa API to any potential competitor of Amarin. Amarin also paid Equateq a $1m "commitment fee" in May2011.[18] Equateq was acquired by BASF in May 2012.

65. Also in 2011, Amarin secured an exclusive supply contract with Korea-based Chemport Inc. ("Chemport"). This agreement contained minimum purchase requirements to

---

[16] Supply Agreement Between (1) Nisshin Pharma Inc. ("Nisshin") and (2) Amarin Pharmaceuticals (Ireland) Ltd. ("Amarin"), dated February 23, 2009, https://www.sec.gov/Archives/edgar/data/897448/000095016209000453/ex4_86.htm (last accessed July 7, 2021).

[17] "Equateq nets £100m deal to supply fish oil for heart treatment," The Scotsman (June 29, 2011), https://www.scotsman.com/business/equateq-nets-ps100m-deal-supply-fish-oil-heart-treatment-1670500 (last accessed July 7, 2021).

[18] Amarin Corp. plc Quarterly Report (Form 10-Q), at 9 (Aug. 9, 2011) ("Following FDA approvals of [Vascepa], both agreements [with Equateq and Chemport Inc. (see para. 53 below)] include annual purchase levels **to enable Amarin to maintain exclusivity with each respective supplier**, and to prevent potential termination of the agreements.").

prevent Chemport from selling API to potential generic manufacturers and also required Amarin to pay Chemport in cash for any shortfall in the minimum purchase obligations. As part of the agreement, Amarin agreed to pay Chemport $1.1m for the purchase of raw materials and to provide an additional $3.3m to Chemport as equity investment.[19] During the nine months ended September 30, 2013, Amarin made payments of $4.8 million to Chemport.[20]

66.     Equateq and Chemport were approved by the FDA to manufacture Vascepa API in April 2013.[21]

67.     In December 2012, Amarin announced that it had entered into an additional exclusive agreement with a fourth supplier, an "exclusive consortium" of companies including Canada-based Slanmhor Pharmaceutical, Inc., Ocean Nutrition Canada, and Novasep (collectively referred to in this Complaint as "Novasep"). As part of the agreement, Amarin agreed to pay up to $2.3 million in development fees and made a commitment of up to $15 million, credited against future API material purchase. Amarin made payments of $3.9 million to Novasep in the quarter in which the agreement was signed, and an additional $1.4 million in the following quarter.[22] The Novasep agreement includes minimum purchase obligations, and Amarin is required to make cash payments to Novasep in the event of a shortfall.[23] During first nine months of 2013, Amarin made payments of $6.1 million to Novasep.[24] In July 2014, Amarin cancelled the agreement with the consortium and in July 2015 it entered a new agreement with Novasep in its own right.[25]

68.     Amarin purchased approximately $25.7 million worth of Vascepa API in 2013 from Nisshin and Chemport, and also paid $13.9 million to Novasep related to "commitments," stability

---

[19] Amarin Corp. plc Annual Report (Form 10-K), at F-25 (Feb. 27, 2014).
[20] Amarin Corp. plc Quarterly Report (Form 10-Q), at 15 (Nov. 7, 2013).
[21] Amarin Corp. plc Quarterly Report (Form 10-Q), at 13 (May 9, 2013).
[22] Amarin Corp. plc Quarterly Report (Form 10-Q), at 13 (May 9, 2013).
[23] Amarin Corp. plc Quarterly Report (Form 10-Q), at 15 (Aug. 8, 2013).
[24] Amarin Corp. plc Quarterly Report (Form 10-Q), at 15 (Nov. 7, 2013).
[25] Amarin Corp. plc Annual Report (Form 10-K), at 14 (Feb. 25, 2016).

and technical batches, and advances on future API purchases.[26]

69.     In October 2013, an FDA review panel voted against expanding Vascepa's approved indications. Although this was expected to result in less-than-hoped-for demand for Vascepa, Novasep and BASF planned to continue supplying Vascepa API at the agreed-upon pace.[27]

70.     Finally, Amarin has secured significant additional supply from another Japan-based supplier, Nippon Suisan, and that company's supply is not available to any U.S. generic.

71.     The foregoing agreements between Amarin and the Vascepa API suppliers were intended to and have limited competition in the market for generic Vascepa. At bottom, the API suppliers took millions of dollars in payments from Amarin in exchange for an agreement *not* to sell the essential API, regardless of whether Amarin needed the API for its own production needs or whether there were other market opportunities for the sale of the API. By foreclosing API supply from generic competitors, Amarin has been able to capture supracompetitive profits from the inflated sales of Vascepa and has shared those supracompetitive profits with the API suppliers to buy their complicity in the anticompetitive scheme.

**D. Amarin secured more than twice the API supply than it needs for legitimate business purposes.**

72.     In February 2019, Amarin's CEO John Thero stated that Amarin's anticipated 2019 sales of Vascepa amounted to $350 million, but the company was purchasing API to support sales of more than $700 million. Thero was clear that Amarin was ***not*** raising its guidance or expecting to sell more than $700 million in Vascepa that year, but was merely purchasing excess supply.[28]

---

[26] Amarin Corp. plc Quarterly Report (Form 10-Q), at 33 (Nov. 7, 2013).
[27] "Novasep to keep supplying Amarin with Vascepa API," Outsourcing-Pharma.com (Oct. 30, 2012), https://www.outsourcing-pharma.com/Article/2013/10/30/Novasep-to-keep-supplying-Amarin-with-Vascepa-API (last accessed July 7, 2021).
[28] Amarin Corp. plc Earnings Call (Feb. 27, 2019), https://www.fool.com/earnings/call-transcripts/_2019/02/27/amarin-corporation-plc-amrn-q4-2018-earnings-confe.aspx (last accessed July 7, 2021).

73.     At the same time that Amarin was purchasing more than twice its supply needs for 2019 from its existing suppliers, Amarin was in the process of locking up 420 tons worth of additional annual supply.[29] For comparison, the entire U.S. market for Vascepa is estimated to require 450 tons per year.

**E.  Amarin's excess supply  makes no economic sense absent anticompetitive advantages and is contrary to industry practice.**

74.     Amarin acknowledged its role in its suppliers' efforts to expand their capacity:

The agreements with each of our API suppliers contemplate phased manufacturing capacity expansions designed to create sufficient manufacturing capacity to meet anticipated demand for API material for [Vascepa] following FDA approval. Accordingly, Nisshin and our other potential suppliers are currently working to expandand qualify their production capabilities to meet regulatory requirements to manufacture the API for [Vascepa]. These API suppliers are self-funding these expansion and qualification plans ***with contributions from Amarin***.'[30]

75.     Amarin provided further detail about the expenses necessary to develop and maintain so many API suppliers:

Among the conditions for FDA approval of a pharmaceutical product is the requirement that the manufacturer's quality control and manufacturing procedures conform to current Good Manufacturing Practice, or cGMP, which must be followed at all times.The FDA typically inspects manufacturing facilities before regulatory approval of a product candidate, such as [Vascepa], and on an ongoing basis. In complying with cGMP regulations, pharmaceutical manufacturers must expend resources and time to ensure compliance with productspecifications as well as production, record keeping, quality control, reporting, and other requirements. Our NDA filed with the FDA for [Vascepa] references one supplier of our API, Nisshin, with which we have had the longest relationship and which we believe is qualified to support our initial commercial launch of [Vascepa]. We have defined with the FDA our plan and specifications for qualifying the additional API suppliers. We intend to submit sNDAs for the use of these additional API suppliers after the suppliers successfully complete the specified process and facility qualifications and after the NDA for the MARINE indication is approved."[31]

---

[29] "Amarin: What The Street Hasn't Factored In And Why Amarin Is Worth $80," Seeking Alpha (Oct. 9, 2018), https://seekingalpha.com/article/4210747-amarin-what-street-hasnt-factored-in-and-why-amarin-is-worth-80   (last accessed July 7, 2021) ("Nippon Suisan (1332 JT), or better known as "Nissui" in the Japanese stock market, has 420 tons worth of annual high-grade EPA supply, solely aimed for thefurther roll-out of Amarin's Vascepa.").
[30] Amarin Corp. plc Annual Report (Form 10-K), at 11 (Feb. 20, 2012) (emphasis added).
[31] Amarin Corp. plc Quarterly Report, at 16 (Nov. 8, 2011).

76.     As these public statements confirm, it is expensive and time consuming for each new API supplier to develop, obtain regulatory approval for, and maintain quality control of its API manufacturing process, and Amarin bears a significant share of that burden.

77.     On the other hand, it is possible and less expensive to scale up the supply from an existing manufacturer than it is to qualify additional suppliers. Consequently, standard industry practice is to have only one or two API suppliers.[32]

78.     In addition to saving initial setup costs, the benefits of scale result in volume discounts, which Amarin foregoes by engaging additional suppliers with minimum purchase requirements.

79.     Given these inefficiencies, the only economic advantages from having four API suppliers, and obtaining excess API inventory, results from the inability of generic competitors to obtain API supply.

**F.  Amarin's scheme succeeded in thwarting generic competition.**

80.     DRL obtained final FDA approval on August 7, 2020 but has still been unable to secure a supply of API sufficient to support a launch of its generic Vascepa.[33]

81.     Hikma, on the other hand, was able to launch on November 5, 2020, but was forced to release limited quantities due to supply constraints.[34]

82.     For its part, Amarin believes its scheme is working, and wants the market to know: "We have heard from various suppliers that they have been approached regarding supplying API

---

[32] Amarin Corp. plc Annual Report (Form 10-K), at 75 (Feb. 27, 2019) ("our current supply chain is scalable"); *see also*, Amarin Corp. plc Earnings Conference Call Transcript (Feb. 27, 2019) ("We have a supplier network that consists of over 20 independent companies. The API piece of that – we have multiple suppliers on. They're competing with one another. *And they're interested in expanding capacity*."), https://www.fool.com/earnings/call-transcripts/2019/02/27/amarin-corporation-plc-amrn-q4-2018-earnings-confe.aspx (last accessed July 7, 2021).
[33] DRL Complaint at ¶ 81.
[34] "Amarin launches Vascepa in all-important Europe as it slowly bleeds share to U.S. generic," Fierce Pharma (Apr. 6, 2021), https://www.fiercepharma.com/marketing/amarin-launches-vascepa-all-important-europe-as-blockbuster-to-be-heart-drug-slowly (last accessed July 7, 2021).

for generic use. These suppliers informed us that they turned down such approaches for various reasons including that they don't have excess capacity."[35] In a press release discussing the Court of Appeals decision, Amarin acknowledged that generic manufacturers "are likely to have limited supply capacity."[36]

## CAUSATION

83.     Generic icosapent ethyl would have entered the market as early as August 2020, the date of DRL's final ANDA approval, because but for Amarin's anticompetitive conduct described above, there would have been sufficient supply of Vascepa API for DRL to do so.

84.     Likewise, Hikma would have launched its generic Vascepa at full supply because, absent Amarin's anticompetitive conduct, there would have been sufficient supply of Vascepa API for Hikma to do so.

85.     Instead, Amarin willfully and unlawfully maintained its monopoly power in the relevant market by entering exclusive contracts with API suppliers and engaging in other conduct alleged herein to exclude generic competition and maintain supracompetitive prices for Vascepa.

86.     The only impediment to DRL's generic icosapent ethyl entering the market is Amarin's unlawful conduct.

87.     Likewise, the only impediment to Hikma's fully supplying demand for generic icosapent ethyl is Amarin's unlawful conduct.

88.     Amarin's conduct had the purpose and effect of preventing competition to Vascepa, permitting Amarin to maintain supracompetitive prices for Vascepa, enabling Amarin to sell

---

[35] Amarin Corp. plc Earnings Call Transcript (Apr. 13, 2020), https://www.fool.com/earnings/call-transcripts/2020/04/13/amarin-corporation-plc-amm-q1-2020-earnings-call.aspx (last accessed July 7, 2021).

[36] Press Release, Amarin Corp. plc, "Amarin Provides Update Following Ruling in Vascepa® ANDA Patent Litigation" (Sept. 3, 2020), https://investor.amarincorp.com/news-releases/news-release-details/amarin-provides-update-following-ruling-vascepar-anda-patent (last accessed July 7, 2021).

Vascepa without competition, and allowing Amarin to reap monopoly profits, to the detriment of purchasers.

## MARKET POWER AND DEFINITION

89.     The pharmaceutical marketplace is characterized by a "disconnect" between product selection and the payment obligation. State laws prohibit pharmacists from dispensing many pharmaceutical products, including Vascepa, to patients without a prescription. The prohibition on dispensing certain products without a prescription creates this disconnect. The patient's doctor chooses which product the patient will buy while the patient (and in most cases his or her insurer) has the obligation to pay for the product.

90.     Brand manufacturers, including Amarin, exploit this price disconnect by employing large sales forces that visit doctors' offices and persuade them to prescribe the brand manufacturers' products. These sales representatives do not advise doctors of the cost of the branded products. Studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are largely insensitive to price differences because they do not pay for the products. The result is a marketplace in which price plays a comparatively unimportant role in product selection.

91.     The relative unimportance of price in the pharmaceutical marketplace reduces what economists call the price elasticity of demand - the extent to which unit sales go down when price goes up. This reduced price elasticity, in turn, gives brand manufacturers the ability to raise prices substantially above marginal cost without losing so many sales as to make the price increase unprofitable. The ability to profitably raise prices substantially above marginal costs is what economists and antitrust courts refer to as market power. The result of these pharmaceutical market imperfections and marketing practices is that brand manufacturers gain and maintain market power

with respect to many branded prescription pharmaceuticals, including Vascepa.

92.     At all relevant times, Amarin had monopoly power in the market for Vascepa because it had the power to exclude competition and/or raise or maintain the price of Vascepa at supracompetitive levels without losing enough sales to make supracompetitive prices unprofitable.

93.     A small but significant non-transitory increase to the price of brand Vascepa would not have caused a significant loss of sales sufficient to make the price increase unprofitable.

94.     Vascepa does not exhibit significant, positive cross-elasticity of demand with respect to price with any other product for the treatment of hypertriglyceridemia.

95.     Brand Vascepa is differentiated from all other products currently on the market for treatment of hypertriglyceridemia.

96.     Amarin needed to control only brand Vascepa, and no other products, in order to maintain the price of icosapent ethyl profitably at supracompetitive prices. Only the market entry of competing, AB-rated generic versions of Vascepa unconstrained by supply issues would render Amarin unable to profitably maintain theirprices for Vascepa without losing substantial sales.

97.     Amarin had, and exercised, the power to exclude generic competition to brand Vascepa.

98.     At all relevant times, Amarin enjoyed high barriers to entry with respect to competition in the relevant product market due to patent and other regulatory protections and high costs of entry and expansion, which protect brand Vascepa from the forces of price competition.

99.     There is direct evidence of market power and anticompetitive effects available in this case sufficient to show Amarin's ability to control the price of Vascepa and generic Vascepa, and to exclude relevant competitors, without the need to show the relevant antitrust markets. The direct evidence consists of, inter alia, the following facts: (a) generic Vascepa would have entered the market at a substantial discount to brand Vascepa but for Amarin's anticompetitive conduct; (b)

Amarin's gross margin on Vascepa at all relevant times was very high; and (c) Amarin never lowered the price of Vascepa to the competitive level in response to the pricing of other brand or generic drugs, and indeed enjoyed rising sales as it dramatically increased the price of Vascepa.

100.     To the extent proof of monopoly power by defining a relevant product market is required, Plaintiff alleges that the relevant antitrust market is the market for Vascepa and its AB-rated generic equivalents.

101.     The United States, the District of Columbia, and the U.S. territories constitute the relevant geographic market.

102.     Amarin's market share in the relevant market was 100% prior to Hikma's constrained generic launch, implying substantial monopoly power.

## MARKET EFFECTS

103.     Amarin willfully and unlawfully maintained its market power by engaging in an overarching scheme to exclude competition. Amarin designed a scheme to delay competition on the products' merits to further Amarin's anticompetitive purpose of forestalling generic competition against Vascepa. Amarin carried out the scheme with the anticompetitive intent and effect of maintaining supracompetitive prices for icosapent ethyl.

104.     Amarin's exclusivity contracts with API suppliers had the purpose and effect of unreasonably restraining and injuring competition by protecting brand Vascepa from generic competition. These actions allowed Amarin to maintain a monopoly and exclude competition in the market for Vascepa and its AB-rated generic equivalents, to the detriment of Plaintiff and all other members of the Classes.

105.     Amarin's exclusionary conduct delayed generic competition and unlawfully enabled Amarin to sell Vascepa without generic competition. Were it not for Amarin's illegal

conduct, one or more generic versions of Vascepa would have entered the market sooner.

106.    Amarin's exclusionary conduct also limited Hikma's launch of generic Vascepa, enabling Amarin to sell Vascepa with reduced generic competition.

107.    Amarin's anticompetitive conduct caused Plaintiff and all members of the Classes to pay more than they would have paid for Vascepa and generic equivalents absent their illegal conduct.

108.    If generic competitors had not been unlawfully prevented from entering the market earlier and competing in the relevant markets, Plaintiff and members of the Classes would have paid less for icosapent ethyl by (a) paying lower prices on their remaining brand purchases of Vascepa, and/or (b) substituting purchases of less-expensive generic Vascepa for their purchases of more-expensive brand Vascepa.

109.    Thus, Amarin's unlawful conduct deprived Plaintiff and members of the Classes of the benefits from the competition that the antitrust laws are designed to ensure.

## ANTITRUST IMPACT

110.    During the relevant time period, Plaintiff and members of the Classes purchased substantial amounts of Vascepa indirectly from Amarin. As a result of Amarin's illegal conduct, Plaintiff and the members of the Classes were compelled to pay, and did pay, artificially inflated prices for Vascepa. Those prices were substantially greater than the prices that members of the Classes would have paid absent the illegal conduct alleged herein, because: (1) the price of brand-name Vascepa was artificially inflated by Amarin's illegal conduct, and (2) members of the Classes have been deprived of the opportunity to purchase lower-priced generic versions of Vascepa. The supracompetitive prices were paid at the point of sale, which is where Plaintiff and the Classes suffered antitrust impact.

111.     As a result, Plaintiff and members of the Classes have sustained substantial damage to their business and property in the form of overcharges. The full amount and form of such damages will be calculated after discovery and upon proof at trial. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge passed through the chain of distribution to Plaintiff and the members of the Classes.

112.     General economic theory recognizes that any overcharge at a higher level of distribution generally results in higher prices at every level below. *See* Hovenkamp, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) at 624. According to Professor Hovenkamp, "[e]very person at every stage in the chain will be poorer as a result of the monopoly price at the top."

113.     Further, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution result in higher prices paid by members of the Classes.

114.     Amarin's anticompetitive actions enabled it to indirectly charge Plaintiff and the Classes prices in excess of what it otherwise would have been able to charge absent its unlawful agreements described herein.

115.     The prices were inflated as a direct and foreseeable result of Amarin's anticompetitive conduct.

116.     The inflated prices the Classes paid are traceable to, and the foreseeable result of, the overcharges by Amarin.

**INTERSTATE AND INTRASTATE COMMERCE**

117.     Amarin's anticompetitive conduct has substantially affected intrastate, interstate,

and foreign commerce.

118.    Amarin's anticompetitive conduct has substantial intrastate effects in that, *inter alia*, it deprived retailers in each state of access to less expensive generic Vascepa that they could sell to consumers within each respective state. The delayed entry of generic Vascepa has directly affected and disrupted commerce for consumers within each state.

119.    During the relevant time period, Vascepa was shipped into each state, and consumers paid for Vascepa in each state.

120.    During the relevant time period, Amarin manufactured, promoted, distributed, and/or sold substantial amounts of Vascepa in a continuous and uninterrupted flow of commerce across state lines and national lines

121.    As a direct result of Amarin's anticompetitive conduct, generic drug manufacturers have been unable to sell their generic versions of Vascepa when they otherwise would have done so.

122.    During the relevant time period, Amarin transmitted money as well as contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the purchase and sale of Vascepa.

123.    During the relevant time period, various devices were used to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign telephonic and electronic commerce. Amarin's activities as alleged in this Complaint were within the flow of, and have substantially affected, intrastate, interstate, and foreign commerce.

## CLASS ACTION ALLEGATIONS

124.    Plaintiff brings this action on its own behalf and on behalf of all others similarly situated as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure ("Damages Class"):

> All persons and entities who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Vascepa, other than for resale, in the States of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming, the District of Columbia, and Puerto Rico, at any time during the period from August 7, 2020 through and until the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period").

125.    Plaintiff brings this action on its own behalf and on behalf of all others similarly situated as a class action under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure ("Injunctive Relief Class"):

> All persons and entities who purchased, paid and/or provided reimbursement for some or all of the purchase price for Vascepa, other than for resale, in the United States at any time during the period from August 7, 2020 through and until the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period").

126.    Excluded from the Classes are:

> a.      Defendants and their counsel, officers, directors, management, employees, subsidiaries, and affiliates;
>
> b.      all federal governmental entities;
>
> c.      all persons or entities who purchased Vascepa for purposes of resale or directly from Amarin or their affiliates;

d.      fully insured health plans (*i.e.*, health plans that purchased insurance from another third-party payer covering 100% of the plan's reimbursement obligations to its members);

e.      any "flat co-pay" consumers whose purchases of Vascepa were paid in part by a third-party payer and whose co-payment was the same regardless of the retail purchase price;

f.      pharmacy benefit managers;

g.      all counsel of record; and

h.      all judges assigned to this case and any members of their immediate families.

127.   Members of the Classes are so numerous that joinder is impracticable. Plaintiff believes that there are hundreds of thousands of members of the Classes, in an amount to be determined in discovery and at trial. Further, the identities of Class members will be readily ascertainable through business records kept in regular order.

128.   Plaintiff's claims are typical of the claims of members of the Classes. Plaintiff and all members of the Classes were damaged by the same wrongful conduct by Defendants, and all paid artificially inflated prices for Vascepa and were deprived of the benefits of competition from less expensive generic versions as a result of Defendants' conduct.

129.   Plaintiff will fairly and adequately protect and represent the interests of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, the Classes.

130.   Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation, and who have particular experience with class action litigation involving the pharmaceutical industry.

131.   Questions of law and fact common to the Classes include:

a.      whether Amarin unlawfully maintained monopoly power through all or part of its overarching scheme;

b.   whether Defendants' anticompetitive conduct suppressed generic competition to Vascepa;

c.   as to those parts of Defendants' challenged conduct for which such justifications may be offered, whether there exist cognizable, non-pretextual procompetitive justifications, which Defendants' challenged conduct was the least restrictive means of achieving, that offset the harm to competition in the markets in which Vascepa is sold;

d.   whether direct proof of Amarin's monopoly power is available, and if available, whether it is sufficient to prove Amarin's monopoly power without the need to also define a relevant market;

e.   to the extent a relevant market or markets must be defined, what that definition is, or those definitions are;

f.   determination of a reasonable estimate of the amount of delay Defendants' unlawful monopolistic, unfair, and unjust conduct caused;

g.   whether Defendants' scheme, in whole or in part, has substantially affected interstate commerce;

h.   whether Defendants' scheme, in whole or in part, has substantially affected intrastate commerce;

i.   whether Defendants foreclosed the supply of icosapent ethyl API.

j.   whether Amarin possessed the ability to control prices and/or exclude competition for Vascepa during the Class Period;

k.   Whether Defendants' unlawful monopolistic conduct was a substantial contributing factor in causing some amount of delay of the entry of AB-rated generic Vascepa;

l.   Whether Defendants' unlawful monopolistic conduct was a substantial contributing factor in limiting the amount of generic Vascepa available upon the launch of the first generic icosapent ethyl product;

m.   whether Defendants' scheme, in whole or in part, caused antitrust injury to the business or property of Plaintiff and members of the Damages Class in the nature of overcharges; and

n.   the quantum of overcharges paid by the Damages Class in the aggregate.

132.   Defendants acted or refused to act on grounds that apply generally to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.

133.     Questions of law and fact common to members of the Damages Class predominate over questions, if any, that may affect only individual Damages Class members, because Defendants have acted on grounds generally applicable to the entire Damages Class. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

134.     Class action treatment is a superior method for the fair and efficient adjudication of this controversy. Among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

135.     Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Act:
### Contract, Combination, or Conspiracy in Restraint of Trade

136.     Plaintiff incorporates by reference all of the allegations above as though fully set forth herein.

137.     Plaintiff brings this claim on behalf of the Injunctive Relief Class.

138.     Defendants violated 15 U.S.C. § 1 by entering into a series of exclusive contracts with various API suppliers that were intended to and did lock up supply of Vascepa API, thereby constraining competition in the market for branded and generic Vascepa.

139.    The agreements between Amarin and each of the API suppliers substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

      a.    prevent generic competitors from obtaining the API necessary to manufacture Vascepa;

      b.    delay the entry of generic versions of Vascepa;

      c.    hamper the ability of generic competitors to meet demand for their generic Vascepa product; and

      d.    raise and maintain the prices that Plaintiff and the Injunctive Relief Class members would pay for Vascepa to and at supra-competitive levels.

140.    There is no legitimate, non-pretextual, procompetitive business justification for the exclusive contracts between Amarin and the API suppliers.

141.    The agreements between Amarin and each of the API suppliers harmed competition in the relevant market.

142.    As a direct and proximate result of Defendants' violation of Sherman Act § 1, Plaintiff and members of the Injunctive Relief Class have been injured in their business and property throughout the Class Period.

143.    Plaintiff and the Injunctive Relief Class are entitled to injunctive and other equitable relief, pursuant to 15 U.S.C. § 26.

## <u>SECOND CLAIM FOR RELIEF</u>

### Violation of Section 2 of the Sherman Act: Monopolization

144.    Plaintiff incorporates by reference all of the allegations above as though fully set forth herein.

145.    Plaintiff brings this claim on behalf of the Injunctive Relief Class.

146.    As described above, throughout the relevant time period Amarin possessed

monopoly power nationwide and in each of the United States and its territories in the market for Vascepa. No other manufacturer sold a competing version of Vascepa during the relevant time period.

147.    At all relevant times, Amarin possessed substantial market power (*i.e.*, monopoly power) in the relevant market. Amarin possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

148.    Through the overarching anticompetitive scheme, as alleged above, Amarin willfully maintained its monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen or a historic accident, and thereby injured Plaintiff and the Injunctive Relief Class. Amarin's anticompetitive conduct was done with the specific intent to maintain their monopoly in the market for Vascepa in the United States and its territories.

149.    Amarin knowingly and intentionally engaged in this anticompetitive scheme to monopolize the market for Vascepa and its generic equivalents as described above. Amarin accomplished this scheme by, *inter alia*, (1) entering into exclusive supply agreements with at least four different icosapent ethyl API suppliers; (2) otherwise foreclosing the supply of icosapent ethyl API; and (3) raising and maintaining prices so that Plaintiff and Class members would pay for Vascepa at supracompetitive prices.

150.    The goal, purpose, and effect of Amarin's scheme was to prevent, delay, and limit the sale of generic Vascepa in the United States at prices significantly below Amarin's prices for Vascepa, thereby effectively preventing the average market price of Vascepa and its generic equivalents from declining dramatically while maintaining and extending its monopoly power with respect to Vascepa.

151.    Plaintiff and members of the Injunctive Relief Class purchased substantial amounts of Vascepa indirectly from Amarin.

152.    As a result of Amarin's illegal conduct, Plaintiff and members of the Injunctive Relief Class were compelled to pay, and did pay, more than they would have paid for their requirements of Vascepa and its generic equivalents absent Amarin's illegal conduct. But for Amarin's illegal conduct, competitors would have begun selling generic Vascepa during the relevant period, and prices for Vascepa and its generic equivalents would have been lower, sooner.

153.    Had manufacturers of generic Vascepa entered the market and lawfully competed with Amarin earlier, Plaintiff and other members of the Injunctive Relief Class would have substituted lower-priced generic Vascepa for the higher-priced brand-name Vascepa for some or all of their requirements of Vascepa and its generic equivalents, and/or would have paid lower net prices on their remaining Vascepa and/or AB-rated bioequivalent purchases

154.    Plaintiff and members of the Injunctive Relief Class will continue to suffer injury, in the form of overcharges paid for Vascepa, if Amarin's unlawful conduct is not enjoined.

155.    Plaintiff and the members of the Injunctive Relief Class therefore seek equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable laws, to correct for the anticompetitive market effects caused by Amarin's unlawful conduct, and to assure that similar anticompetitive conduct and effects do not continue or reoccur in the future

## THIRD CLAIM FOR RELIEF

### Violations of State Antitrust Law

156.    Plaintiff incorporates by reference all of the allegations above as though fully set forth herein.

157.    Plaintiff brings this claim on behalf of the Damages Class.

158.   The relevant market consists of Vascepa and its generic equivalents.

159.   As described above, throughout the relevant time period Amarin possessed monopoly power nationwide and in each of the state and its territories in the market for Vascepa and its generic equivalents.

160.   At all relevant times, Amarin possessed substantial market power (*i.e.*, monopoly power) in the relevant market. Amarin possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

161.   Through the overarching anticompetitive scheme, as alleged above, Amarin willfully maintained monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen or a historic accident, and thereby injured Plaintiff and the Classes. Amarin's anticompetitive conduct was done with the specific intent to maintain its monopoly in the market for Vascepa in the United States.

162.   Amarin knowingly and intentionally engaged in this anticompetitive scheme to monopolize the Vascepa market as described above. Amarin accomplished this scheme by, *inter alia*, (1) entering into exclusive supply agreements with at least four different icosapent ethyl API suppliers; (2) otherwise foreclosing the supply of icosapent ethyl API; and (3) raising and maintaining prices so that Plaintiff and members of the Classes would pay for Vascepa at supracompetitive prices.

163.   The agreements between Amarin and each of the API suppliers substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

a.   prevent generic competitors from obtaining the API necessary to manufacture Vascepa;

b.   delay the entry of generic versions of Vascepa;

    c.   hamper the ability of generic competitors to meet demand for their generic Vascepa product; and

    d.   raise and maintain the prices that Plaintiff and the Injunction Class members would pay for Vascepa to and at supra-competitive levels.

164.    There is no legitimate, non-pretextual, procompetitive business justification for the exclusive contracts between Amarin and the API suppliers.

165.    The agreements between Amarin and each of the API suppliers did in fact harm competition in the relevant market.

166.    The goal, purpose, and effect of Amarin's scheme was to prevent and delay the sale of generic Vascepa in the United States at prices significantly below Amarin's prices for Vascepa, thereby effectively preventing the average market price of Vascepa and its generic equivalents from declining dramatically.

167.    The goal, purpose and effect of Amarin's scheme was also to maintain and extend its monopoly power with respect to Vascepa and its generic equivalents. Amarin's illegal scheme allowed it to continue charging supracompetitive prices for Vascepa, without a substantial loss of sales, reaping substantial unlawful monopoly profits.

168.    Plaintiff and members of the Damages Class purchased substantial amounts of Vascepa indirectly from Amarin.

169.    As a result of Amarin's illegal conduct, Plaintiff and members of the Damages Class were compelled to pay, and did pay, more than they would have paid for their requirements of Vascepa and its generic equivalents absent Amarin's illegal conduct. But for Amarin's illegal conduct, competitors would have begun selling generic Vascepa during the relevant period, and prices for Vascepa and its generic equivalents would have been lower, sooner.

170.    Had manufacturers of generic Vascepa entered the market and lawfully competed

with Amarin earlier, Plaintiff and other members of the Damages Class would have substituted lower-priced generic Vascepa for the higher-priced brand-name Vascepa for some or all of their requirements of Vascepa and its generic equivalents, and/or would have paid lower net prices on their remaining Vascepa and/or AB-rated bioequivalent purchases.

171.    By engaging in the foregoing conduct, Amarin violated the following state antitrust laws:

    a.  Arizona Rev. Stat. §§ 44-1403, *et seq.*, with respect to purchases of Vascepa and AB-rated bioequivalents in Arizona by members of the Damages Class.

    b.  Cal. Bus. & Prof. Code §§ 16700, with respect to purchases of Vascepa and AB-rated bioequivalents inCalifornia by members of the Damages Class.

    c.  C.G.S.A. §§ 35-27, *et seq.*, with respect to purchases of Vascepa and AB-rated bioequivalents in Connecticut by members of the Damages Class.

    d.  D.C. Code §§ 28-4503, *et seq.*, with respect to purchases of Vascepa and AB-rated bioequivalents in the District of Columbia by members of the Damages Class.

    e.  Hawaii Rev. Stat. 480-1, *et seq.* with respect to purchases of Vascepa and AB-rated bioequivalents in Hawaii by members of the Damages Class.

    f.  Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.*, with respect to purchases of Vascepa and AB-rated bioequivalents in Illinois by members of the Damages Class.

    g.  Iowa Code §§ 553.5 *et seq.*, with respect to purchases of Vascepa and AB-rated bioequivalents in Iowa by members of the Damages Class.

    h.  Kansas Stat. Ann. § 50-101 *et seq.*, with respect to purchases of Vascepa and AB-rated bioequivalents in Kansas by members of the Damages Class.

    i.  Me. Rev. Stat. Ann. 10, §§ 1102, *et seq.*, with respect to purchases of Vascepa and AB-rated bioequivalents in Maine by consumer members of the Damages Class.

    j.  Md. Com'l Law Code Ann. § 11-204(a), *et seq.*, with respect to purchases of Vascepa and AB-rated bioequivalents in Maryland by members of the Damages Class.

    k.  Mich. Comp. Laws Ann. §§ 445.773, *et seq.*, with respect to purchases of

Vascepa and AB-rated bioequivalents in Michigan by members of the Damages Class.

l.  Minn. Stat. §§ 325D.49, *et seq.*, and Minn. Stat. § 8.31, *et seq.*, with respect to purchases of Vascepa and AB-rated bioequivalents in Minnesota by members of the Damages Class.

m.  Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of Vascepa and AB-rated bioequivalents in Mississippi by members of the Damages Class.

n.  Neb. Code Ann. §§ 59-802, *et seq.*, with respect to purchases of Vascepa and AB-rated bioequivalents in Nebraska by members of the Damages Class.

o.  Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases of Vascepa and AB-rated bioequivalents in Nevada by members of the Damages Class.

p.  N.H. Rev. Stat. Ann. §§ 356.11, *et seq.*, with respect to purchases of Vascepa and AB-rated bioequivalents in New Hampshire by members of the Damages Class.

q.  N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases of Vascepa and AB-rated bioequivalents in New Mexico by members of the Damages Class.

r.  N.Y. Gen. Bus. Law § 340, *et seq.*, with respect to purchases of Vascepa and AB-rated bioequivalents in New York by members of the Damages Class.

s.  N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases of Vascepa and AB-rated bioequivalents in North Carolina by members of the Damages Class.

t.  N.D. Cent. Code §§ 51-08.1-03, *et seq.*, with respect to purchases of Vascepa and AB-rated bioequivalents in North Dakota by members of the Damages Class.

u.  Or. Rev. Stat. § 646.730, *et seq.*, with respect to purchases of Vascepa and AB-rated bioequivalents in Oregon by members of the Damages Class.

v.  R.I. Gen. Laws §§ 6-36-5 *et seq.*, with respect to purchases of Vascepa and AB-rated bioequivalents in Rhode Island by members of the Damages Class.

w.  S.D. Codified Laws §§ 37-1-3.2, *et seq.*, with respect to purchases of Vascepa and AB-rated bioequivalents in South Dakota by members of the Damages Class.

x.  Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of Vascepa and AB-rated bioequivalents in Tennessee by members of the Damages Class.

y.   Utah Code Ann. §§ 76-10-911, *et seq*., with respect to purchases of Vascepa and AB-rated bioequivalents in Utah by members of the Damages Class.

z.   Vt. Stat. Ann. 9, §§ 2453, *et seq*., with respect to purchases of Vascepa and AB-rated bioequivalents in Vermont by consumer members of the Damages Class.

aa.   W.Va. Code §§ 47-18-4, *et seq.*, with respect to purchases of Vascepa and AB-rated bioequivalents in West Virginia by members of the Damages Class.

bb.   Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases of Vascepa and AB-rated bioequivalents in Wisconsin by members of the Damages Class.

172.   Plaintiff and members of the Damages Class have been injured in their business or property by reason of Amarin's antitrust violations alleged in this Claim. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced generic Vascepa, and (2) paying higher prices for Vascepa and its generic equivalents than they would have paid in the absence of Amarin's conduct. These injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Amarin's conduct unlawful.

173.   Plaintiff and the Damages Class seek damages and multiple damages as permitted by law for their injuries by Amarin's violations of the aforementioned statutes.

## FOURTH CLAIM FOR RELIEF

### Unfair or Deceptive Trade Practices Under State Law

174.   Plaintiff incorporates by reference all of the allegations above as though fully set forth herein.

175.   Plaintiff brings this claim on behalf of the Damages Class.

176.   Defendants engaged in unfair competition, and/or unfair/unconscionable, and/or deceptive acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair and/or

unconscionable acts or practices, Plaintiff and Damages Class members were deprived of the opportunity to purchase a less expensive AB-rated bioequivalent of Vascepa and forced to pay higher prices in violation of the following consumer protection statutes:

    a. Alaska Stat. Ann. § 45.50.471, et seq., with respect to purchases of Vascepa or AB-rated bioequivalents in Alaska by members of the Damages Class. Defendants engaged in unfair methods of competition and unfair practices in the conduct of trade and commerce.

    b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases of Vascepa or AB-rated bioequivalents in California by members of the Damages Class. Defendants engaged in business practices that are unfair in that they are immoral, unethical, oppressive, unscrupulous, and substantially injurious to Damages Class members. There are no countervailing benefits to Damages Class members and any utility of Defendants' conduct is outweighed by the consequences to Damages Class members.

    c. Fla. Stat. §§ 501.201, et seq., with respect to purchases of Vascepa or AB-rated bioequivalents in Florida by members of the Damages Class. Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.

    d. Mass. Gen. Laws ch. 93A, with respect to purchases of Vascepa or AB-rated bioequivalents in Massachusetts by members of the Damages Class. Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade and commerce.

    e. Mo. Rev. Stat. §§ 407.020 et seq., with respect to purchases of Vascepa or AB-rated bioequivalents in Missouri by consumer members of the Damages Class. Defendants engaged in unfair practices in trade or commerce.

    f. Mont. Code Ann. §§ 30-14-101, et seq., with respect to purchases of Vascepa or AB-rated bioequivalents in Montana by consumer members of the Damages Class. Defendants engaged in unfair and deceptive acts and practices.

    g. S.C. Code Ann. §§ 39-5-20, et seq., with respect to purchases of Vascepa or AB-rated bioequivalents in South Carolina by Damages Class members. Defendants engaged in unfair methods of competition and unfair practices in the conduct of trade and commerce. Defendants' conduct is offensive to public policy and immoral, unethical, and oppressive.

    h. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases of Vascepa or AB-rated bioequivalents in Vermont by consumer members of the Damages Class. Defendants engaged in unfair methods of competition, unfair practices, and

deceptive practices in the conduct of trade and commerce.

177.    Plaintiff and members of the Damages Class have been injured in their business and property by reason of Defendants' anticompetitive, unfair/unconscionable, and/or deceptive acts or practices alleged in this Count. Their injury consists of paying higher prices for Vascepa and/or AB-rated generic bioequivalents than they would have paid in the absence of these violations. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

## FIFTH CLAIM FOR RELIEF

### Unjust Enrichment Under State Law

178.    Plaintiff incorporates by reference all of the allegations above as though fully set forth herein.

179.    Plaintiff brings this claim on behalf of the Damages Class.

180.    To the extent required, this claim is pleaded in the alternative to the other claims in this complaint.

181.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Vascepa.

182.    Defendants' financial benefits are traceable to Plaintiff's and Damages Class members' overpayments for Vascepa.

183.    Plaintiff and Damages Class members have conferred and continue to confer an economic benefit upon Defendants in the nature of profits resulting from the unlawful overcharges described herein, to the economic detriment of Plaintiff and Damages Class members.

184.    Defendants have benefited from their unlawful acts and it would be inequitable for

Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff and the members of the Damages Class for Vascepa manufactured by Defendants during the Class Period.

185.    It would be futile for Plaintiff and Damages Class members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Vascepa, as those intermediaries are not liable and would not compensate Plaintiff and Damages Class members for Defendants' unlawful conduct.

186.    The economic benefit Defendants derived from overcharging Plaintiff and Damages Class members for Vascepa is a direct and proximate result of Defendants' unlawful and anticompetitive practices.

187.    The financial benefits Defendants derived are ill-gotten gains that rightfully belong to Plaintiff and Damages Class members, who paid and continue to pay artificially inflated prices that inured to Defendants' benefit.

188.    It would be inequitable under unjust enrichment principles under the laws of the states described below for Defendants to retain any of the overcharges Plaintiff and Damages Class members paid for Vascepa that were derived from Defendants' unfair, anticompetitive, and unlawful methods, acts, and trade practices.

189.    Defendants are aware of and appreciate the benefits that Plaintiff and the Damages Class members have bestowed upon them.

190.    Defendants should be ordered to disgorge all unlawful or inequitable proceeds they received in a common fund for the benefit of Plaintiff and Damages Class members, who collectively have no adequate remedy at law.

191.    A constructive trust should be imposed upon all unlawful or inequitable sums

Defendants received, which arise from overpayments for branded and generic versions of Vascepa by Plaintiff and the Damages Class members.

192.    Plaintiff and Damages Class members have no adequate remedy at law.

193.    By engaging in the foregoing unlawful or inequitable conduct, which deprived Plaintiff and the Damages Class members of the opportunity to purchase lower-priced generic versions of Vascepa and forced them to pay higher prices for branded and generic versions of Vascepa, Defendants have been unjustly enriched in violation of the common law of various states and commonwealths, as outlined below:

**Alabama**

194.    Defendants unlawfully overcharged end-payers who made purchases of or reimbursements for branded and generic versions of Vascepa in Alabama at prices that were more than they would have been but for Defendants' actions.

195.    Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

196.    Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiff and Damages Class members.

197.    Defendants have benefitted at the expense of Plaintiff and Damages Class members from revenue resulting from unlawful overcharges for branded and generic versions of Vascepa.

**Alaska**

198.    Defendants unlawfully overcharged end-payers who made purchases of or reimbursements for branded and generic versions of Vascepa in Alaska at prices that were more

than they would have been but for Defendants' actions.

199.   Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

200.   Defendants appreciated the benefits bestowed upon them by Plaintiff and Damages Class members.

201.   Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiff and Damages Class members.

202.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Damages Class members.

203.   Defendants have benefitted at the expense of Plaintiff and Damages Class members from revenue resulting from unlawful overcharges for branded and generic versions of Vascepa.

**Arizona**

204.   Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Arizona at prices that were more than they would have been but for Defendants' actions.

205.   Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Vascepa.

206.   Plaintiff and Damages Class members have been impoverished by the overcharges for branded and generic versions of Vascepa resulting from Defendants' unlawful conduct.

207.   Defendants' enrichment and Plaintiff's impoverishment are connected. Defendants have paid no consideration to any other person for any benefits they received from Plaintiff and

Damages Class Members.

208.    There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiff's impoverishment, because Plaintiff paid anticompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

209.    Plaintiff and Damages Class members have no remedy at law.

**Arkansas**

210.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Arkansas at prices that were more than they would have been but for Defendants' actions.

211.    Defendants received money from Plaintiff and Damages Class members as a direct result of the unlawful overcharges and have retained this money.

212.    Defendants have paid no consideration to any other person in exchange for this money.

213.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Damages Class members.

**California**

214.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in California at prices that were more than they would have been but for Defendants' actions.

215.    Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

216.     Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiff and Damages Class members.

**Colorado**

217.     Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Colorado at prices that were more than they would have been but for Defendants' actions.

218.     Defendants have received a benefit from Plaintiff and Damages Class members in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.

219.     Defendants have benefitted at the expense of Plaintiff and Damages Class members.

220.     Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Damages Class members.

**Connecticut**

221.     Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Connecticut at prices that were more than they would have been but for Defendants' actions.

222.     Defendants were benefitted in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

223.     Defendants have paid no consideration to any other person in exchange for this benefit.

224.     Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiff and Damages Class members.

**Delaware**

225.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Delaware at prices that were more than they would have been but for Defendants' actions.

226.    Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Vascepa.

227.    Plaintiff and Damages Class members have been impoverished by the overcharges for branded and generic versions of Vascepa resulting from Defendants' unlawful conduct.

228.    Defendants' enrichment and Plaintiff's impoverishment are connected.

229.    There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiff and Damages Class members paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

230.    Plaintiff and Damages Class members have no remedy at law.

**Florida**

231.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Florida at prices that were more than they would have been but for Defendants' actions.

232.    Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and the Damages Class members.

233.    Defendants appreciated the benefits bestowed upon them by Plaintiff and the Damages Class members.

234.    It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiff and the Damages Class members.

**Georgia**

235.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Georgia at prices that were more than they would have been but for Defendants' actions.

236.    Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

237.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Damages Class members.

**Hawaii**

238.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Hawaii at prices that were more than they would have been but for Defendants' actions.

239.    Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

240.    It is unjust for Defendants to retain the benefits received without compensating Plaintiff and Damages Class members.

**Idaho**

241.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Idaho at prices that were more

than they would have been but for Defendants' actions.

242.   Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

243.   Defendants appreciated the benefit conferred upon them by Plaintiff and Damages Class members.

244.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Damages Class members.

**Illinois**

245.   Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Illinois at prices that were more than they would have been but for Defendants' actions.

246.   Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

247.   Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiff and Damages Class members.

248.   It is unjust and inequitable for Defendants to retain the benefits received without compensating Plaintiff and Damages Class members.

**Iowa**

249.   Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Iowa at prices that were more than they would have been but for Defendants' actions.

250.     Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Vascepa, which revenue resulted from anticompetitive prices paid by Plaintiff and the Damages Class members, which inured to Defendants' benefit.

251.     Defendants' enrichment has occurred at the expense of Plaintiff and Damages Class members.

252.     It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Kansas**

253.     Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Kansas at prices that were more than they would have been but for Defendants' actions.

254.     Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

255.     Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiff and Damages Class members.

256.     Defendants were unjustly enriched at the expense of Plaintiff and Damages Class members.

**Kentucky**

257.     Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Kentucky at prices that were more than they would have been but for Defendants' actions.

258.     Plaintiff and Damages Class members have conferred an economic benefit upon

Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

259.    Defendants appreciated the benefit conferred upon them by Plaintiff and Damages Class members.

260.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Damages Class members.

**Louisiana**

261.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Louisiana at prices that were more than they would have been but for Defendants' actions.

262.    Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Vascepa.

263.    Plaintiff and Damages Class members have been impoverished by the overcharges for branded and generic versions of Vascepa resulting from Defendants' unlawful conduct.

264.    Defendants' enrichment and Plaintiff's impoverishment are connected.

265.    There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiff and Damages Class members paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

266.    Plaintiff and Damages Class members have no other remedy at law.

**Maine**

267.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Maine at prices that were more

than they would have been but for Defendants' actions.

268.   Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

269.   Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiff and Damages Class members.

270.   Defendants were aware of and appreciated the benefit bestowed upon them by Plaintiff and Damages Class members.

271.   Defendants were unjustly enriched at the expense of Plaintiff and Damages Class members.

**Maryland**

272.   Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Maryland at prices that were more than they would have been but for Defendants' actions.

273.   Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

274.   Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiff and Damages Class members.

275.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Damages Class members.

**Massachusetts**

276.   Defendants unlawfully overcharged end-payers, who made purchases of or

reimbursements for branded and generic versions of Vascepa in Massachusetts at prices that were more than they would have been but for Defendants' actions.

277.    Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

278.    Defendants were aware of or appreciated the benefit conferred upon them by Plaintiff and Damages Class members.

279.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Damages Class members. Fairness and good conscience require that Defendants not be permitted to retain the revenue resulting from their unlawful overcharges at the expense of Plaintiff and Damages Class members.

**Michigan**

280.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Michigan at prices that were more than they would have been but for Defendants' actions.

281.    Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

282.    Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiff and Damages Class members.

283.    Defendants were unjustly enriched at the expense of Plaintiff and Damages Class members.

**Minnesota**

284.     Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Minnesota at prices that were more than they would have been but for Defendants' actions.

285.     Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiff and Damages Class members. Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiff and Damages Class members.

286.     It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiff and Damages Class members.

**Mississippi**

287.     Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Mississippi at prices that were more than they would have been but for Defendants' actions.

288.     Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members

289.     Defendants retained the benefit of overcharges received on the sales of branded and generic versions of Vascepa, which in equity and good conscience belong to Plaintiff and Damages Class members on account of Defendants' anticompetitive conduct.

**Missouri**

290.     Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Missouri at prices that were more than they would have been but for Defendants' actions.

291.    Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

292.    Defendants appreciated the benefit bestowed upon them by Plaintiff and Damages Class members.

293.    Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiff and Damages Class members.

**Montana**

294.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Montana at prices that were more than they would have been but for Defendants' actions.

295.    Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

296.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Damages Class members.

**Nebraska**

297.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Nebraska at prices that were more than they would have been but for Defendants' actions.

298.    Defendants received money from Plaintiff and Damages Class members as a direct result of the unlawful overcharges and have retained this money. Defendants have paid no

consideration to any other person in exchange for this money.

299.    In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to Plaintiff and Damages Class members.

**Nevada**

300.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Nevada at prices that were more than they would have been but for Defendants' actions.

301.    Plaintiff and Damages Class members have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges for branded and generic versions of Vascepa.

302.    Defendants appreciated the benefits bestowed upon them by Plaintiff and Damages Class members, for which they have paid no consideration to any other person.

303.    Defendants have knowingly accepted and retained the benefits bestowed upon them by Plaintiff and Damages Class members.

304.    The circumstances under which Defendants have accepted and retained the benefits bestowed upon them by Plaintiff and Damages Class members are inequitable in that they result from Defendants' unlawful overcharges for branded and generic versions of Vascepa.

**New Hampshire**

305.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in New Hampshire at prices that were more than they would have been but for Defendants' actions.

306.    Defendants have received a benefit from Plaintiff and Damages Class members in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from

anticompetitive prices that inured to the benefit of Defendants.

307.    Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

**New Jersey**

308.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in New Jersey at prices that were more than they would have been but for Defendants' actions.

309.    Defendants have received a benefit from Plaintiff and Damages Class members in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.

310.    The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiff and Damages Class members.

311.    Defendants have paid no consideration to any other person for any of the unlawful benefits they received from Plaintiff and Damages Class members with respect to Defendants' sales of branded and generic versions of Vascepa.

312.    Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiff and Damages Class members.

**New Mexico**

313.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in New Mexico at prices that were more than they would have been but for Defendants' actions.

314.    Defendants have knowingly benefitted at the expense of Plaintiff and Damages

Class members from revenue resulting from unlawful overcharges for branded and generic versions of Vascepa.

315.     To allow Defendants to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received.

**New York**

316.     Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in New York at prices that were more than they would have been but for Defendants' actions.

317.     Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Vascepa, which revenue resulted from anticompetitive prices paid by Plaintiff and Damages Class members, which inured to Defendants' benefit.

318.     Defendants' enrichment has occurred at the expense of Plaintiff and Damages Class members.

319.     It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**North Carolina**

320.     Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in North Carolina at prices that were more than they would have been but for Defendants' actions.

321.     Plaintiff and Damages Class Members have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

322.     Plaintiff did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

323.     The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from Defendants' actions to delay entry of generic versions of Vascepa to the market.

324.     The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records and documents relating to Defendants' anticompetitive conduct.

325.     Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

**North Dakota**

326.     Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in North Dakota at prices that were more than they would have been but for Defendants' actions.

327.     Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Vascepa.

328.     Plaintiff and Damages Class members have been impoverished by the overcharges for branded and generic versions of Vascepa resulting from Defendants' unlawful conduct.

329.     Defendants' enrichment and Plaintiff's impoverishment are connected. Defendants have paid no consideration to any other person for any benefits they received directly or indirectly from Plaintiff and Damages Class members.

330.     There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiff and Damages Class members paid anticompetitive prices that inured

to Defendants' benefit, andit would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

331.    Plaintiff and Damages Class members have no remedy at law.

**Oklahoma**

332.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Oklahoma at prices that were more than they would have been but for Defendants' actions.

333.    Defendants received money from Plaintiff and Damages Class members as a direct result of the unlawful overcharges and have retained this money.

334.    Defendants have paid no consideration to any other person in exchange for this money.

335.    Plaintiff and Damages Class members have no remedy at law.

336.    It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Oregon**

337.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Oregon at prices that were more than they would have been but for Defendants' actions.

338.    Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

339.    Defendants were aware of the benefit bestowed upon them by Plaintiff and Damages Class members.

340.     It would be inequitable and unjust for Defendants to retain any of the overcharges for Vascepa derived from Defendants' unfair conduct without compensating Plaintiff and Class members.

**Pennsylvania**

341.     Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Pennsylvania at prices that were more than they would have been but for Defendants' actions.

342.     Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

343.     Defendants appreciated the benefit bestowed upon them by Plaintiff and Damages Class members.

344.     Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Damages Class members.

**Rhode Island**

345.     Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Rhode Island at prices that were more than they would have been but for Defendants' actions.

346.     Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

347.     Defendants were aware of and/or recognized the benefit bestowed upon them by Plaintiff and the Damages Class members.

348.     Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Damages Class members.

**South Carolina**

349.     Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in South Carolina at prices that were more than they would have been but for Defendants' actions.

350.     The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges to Plaintiff and Damages Class members.

351.     Defendants realized value from the benefit bestowed upon them by Plaintiff and Damages Class members.

352.     Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Damages Class members.

**South Dakota**

353.     Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in South Dakota at prices that were more than they would have been but for Defendants' actions.

354.     Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

355.     Defendants were aware of the benefit bestowed upon them by Plaintiff and Damages Class members.

356.     Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiff and Damages Class members.

**Tennessee**

357.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Tennessee at prices that were more than they would have been but for Defendants' actions.

358.    Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

359.    Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiff and Damages Class members.

360.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Damages Class members.

361.    It would be futile for Plaintiff and Damages Class members to exhaust all remedies against the entities with which Plaintiff and Damages Class members have privity of contract because Plaintiff and Damages Class members did not purchase branded or generic versions of Vascepa directly from any Defendant.

**Texas**

362.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Texas at prices that were more than they would have been but for Defendants' actions.

363.    Defendants have received a benefit from Plaintiff and Damages Class members in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.

364.    Defendants were aware of or appreciated the benefit bestowed upon them by

Plaintiff and Damages Class members.

365.    The circumstances under which Defendants have retained the benefits bestowed upon them by Plaintiff and Damages Class members are inequitable in that they result from Defendants' unlawful overcharges for branded and generic versions of Vascepa.

366.    Plaintiff and Damages Class members have no remedy at law

**Utah**

367.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Utah at prices that were more than they would have been but for Defendants' actions.

368.    Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

369.    Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiff and Damages Class members.

370.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Damages Class members.

**Vermont**

371.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Vermont at prices that were more than they would have been but for Defendants' actions.

372.    Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

373.    Defendants accepted the benefit bestowed upon them by Plaintiff and Damages Class members.

374.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Damages Class members.

**Virginia**

375.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Virginia at prices that were more than they would have been but for Defendants' actions.

376.    Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

377.    Defendants were aware of the benefit bestowed upon them.

378.    Defendants should reasonably have expected to repay Plaintiff and Damages Class members.

379.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of branded and generic versions of Vascepa.

380.    Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiff and Damages Class members.

**Washington**

381.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Washington at prices that were more than they would have been but for Defendants' actions.

382.    Plaintiff and the Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

383.    Defendants were aware of or appreciated the benefit conferred upon them by Plaintiff and Damages Class members.

384.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Damages Class members.

**West Virginia**

385.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in West Virginia at prices that were more than they would have been but for Defendants' actions.

386.    Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

387.    Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiff and Damages Class members.

388.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Damages Class members.

**Wisconsin**

389.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Wisconsin at prices that were more than they would have been but for Defendants' actions.

390.    Plaintiff and Damages Class members have conferred an economic benefit upon

Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

391.    Defendants appreciated the benefit bestowed upon them by Plaintiff and Damages Class members.

392.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Damages Class members.

**Wyoming**

393.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Wyoming at prices that were more than they would have been but for Defendants' actions.

394.    Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Damages Class members.

395.    Defendants accepted, used and enjoyed the benefits bestowed upon them by Plaintiff and Damages Class members.

396.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiff and Damages Class members.

**District of Columbia**

397.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in the District of Columbia at prices that were more than they would have been but for Defendants' actions.

398.    Plaintiff and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic

detriment of Plaintiff and Damages Class members.

399.    Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiff and Damages Class members.

400.    Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

**Puerto Rico**

401.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Vascepa in Puerto Rico at prices that were more than they would have been but for Defendants' actions.

402.    Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Vascepa.

403.    Plaintiff and Damages Class members have been impoverished by the overcharges for branded and generic versions of Vascepa resulting from Defendants' unlawful conduct.

404.    Defendants' enrichment and Plaintiff's impoverishment are connected.

405.    There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiff's impoverishment, because Plaintiff paid anticompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

406.    Plaintiff and Damages Class members have no remedy at law.

**DEMAND FOR JUDGMENT**

WHEREFORE, Plaintiff, on its own behalf and on behalf of the proposed Classes, prays for judgment against Defendants and that this Court:

a.    Determine that this action may be maintained as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonablenotice of this action, as provided by Rule 23(c)(2), be given to the Classes, and appoint Plaintiff as the named representative of the Classes;

b.    Award Plaintiff and the Damages Class treble damages (*i.e.,* three times overcharges) in an amount to be determined at trial, plus interest in accordance withlaw;

c.    Grant Plaintiff and the Injunctive Relief Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

d.    Award Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees as provided by law;

e.    Permanently enjoin Defendants both from continuing the unlawful conduct allegedhere, and from engaging in similar or related conduct in the future; and

f.    Award such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself and the proposed Classes, demands a trial by jury of all issues so triable.

Dated: July 7, 2021

*/s/ John A. Macoretta*

John A. Macoretta
Jeffrey L. Kodroff
Diana J. Zinser
**SPECTOR ROSEMAN & KODROFF, P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Phone: (215) 496-0300
Fax: (215) 496-6611
jmacoretta@srkattorneys.com
jkodroff@srkattorneys.com
dzinser@srkattorneys.com

Stephen C. Richman
Matthew D. Areman
**MARKOWITZ & RICHMAN**
24 Wilkins Place
Haddonfield, NJ 08033
Phone: (800) 590-4561
Fax: (215) 790-0668
srichman@markowitzrichman.com
mareman@markowitzrichman.com

*Counsel for Plaintiff Teamsters Health &*
*Welfare Fund of Philadelphia and Vicinity and*
*the Proposed Class*